# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHANE BAUER, | ) | |
| AL BAUER, CINDY FISCHER, | ) | |
| NICOLE LINDSTROM, and | ) | |
| SHANNON BAUER, | ) | |
| c/o Gilbert LLP | ) | |
| 700 Pennsylvania Ave., SE | ) | |
| Suite 400 | ) | |
| Washington, DC 20003 | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JURY DEMAND |
| | ) | |
| GOVERNMENT OF THE | ) | Case No.: _____ |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| Its Ministries, Agencies, and | ) | |
| Instrumentalities, | ) | |
| c/o Ministry of Foreign Affairs | ) | |
| Iman Khomeini Avenue | ) | |
| P.O. Box 1136914811 | ) | |
| Tehran, Iran | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Shane Bauer, Al Bauer, Cindy Fisher, Nicole Lindstrom, and Shannon Bauer complain of the actions of Defendant, the Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities, and state in support thereof as follows:

## PARTIES

1.     Plaintiff Shane Bauer is a U.S. citizen and a resident of California.  At the age of 27, Shane was falsely imprisoned and tortured for 781 days (more than two years) by Defendant the Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities ("Iran").

2.      Plaintiff Al Bauer is Shane's father and a U.S. citizen.  He suffered severe emotional distress as a result of his son's imprisonment and torture by Iran.

3.      Plaintiff Cindy Fischer is Shane's mother and a U.S. citizen.  She suffered severe emotional distress as a result of her son's imprisonment and torture by Iran.

4.      Plaintiff Nicole Lindstrom is Shane's sister and a U.S. citizen.  She suffered severe emotional distress as a result of her brother's imprisonment and torture by Iran.

5.      Plaintiff Shannon Bauer is Shane's sister and a U.S. citizen.  She suffered severe emotional distress as a result of her brother's imprisonment and torture by Iran.

6.      Iran is a foreign sovereign that the Secretary of State of the United States designated as a state sponsor of terrorism on January 19, 1984.  *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (citing 50 U.S.C. App. § 2405(j) ("The Export Administration Act of 1979"), *repealed and replaced by* 50 U.S.C. § 4813(c)(3) ("The Export Control Reform Act of 2018")).[1] Its activities as complained of herein are outside the scope of immunity provided by the Foreign Sovereign Immunities Act ("FSIA"), including 28 U.S.C. § 1605A.

## JURISDICTION

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331, and pursuant to the FSIA, 28 U.S.C. § 1605A.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4).

## STATEMENT OF FACTS

9.      Shane was born in 1982 in Le Center, Minnesota.  He is the eldest of three children, and has two younger sisters, Nicole and Shannon.  Following their parents' divorce, Shane, Nicole, and Shannon lived primarily with their mother in Minnesota while maintaining a

---

[1] *See also State Sponsors of Terrorism*, United States Department of State, https://www.state.gov/j/ct/list/c14151.htm (last visited April 22, 2022).

strong relationship with their father in California; Al would visit Minnesota once a month, and the siblings visited their father in California during the summers.  When Shane reached high school, he moved to live full-time with his father in California.  Although Shane's childhood was split between two states, he maintained very close-knit relationships with his parents and sisters.

10.     After graduating high school, Shane remained in Oakland, California.  He later became a welder, and worked for various companies.  At age nineteen, Shane quit his job, and began to travel, including to Europe and the Middle East, where he lived for one year.

11.     In 2002, Shane returned to the U.S. from the Middle East after rumors of war between the U.S. and Iraq surfaced.  Upon his return, he studied journalism, Peace Studies, and Arabic at the University of California, Berkeley.  While in college, Shane became increasingly involved with protesting and activism, during which time he met and began dating Sarah Shourd.

12.     During and after college, Shane continued his travels to Sudan, Ethiopia, and Syria while he worked as a freelance journalist.  Shane made efforts to stay in touch with his family even when abroad—although they were separated by time zones and thousands of miles, Shane would make sure to take a break from his activities to Skype his parents and sisters from an internet café and check in by email.

13.     In 2008, Shane moved to the Middle East—first to Yemen, then later to Syria—with Ms. Shourd.  Shane wanted to continue his freelance journalism, and he was excited to put his study of the Arabic language into practice and further immerse himself in Middle Eastern culture.

## Shane's Imprisonment in Iran

14.     Approximately six months after Shane and Ms. Shourd relocated to Syria, they decided to take a trip to Iraqi Kurdistan.  Unlike other places in the Middle East, Kurdistan was

known for being a U.S.-friendly destination, and it was a popular tourist spot for Europeans.

Two of Shane and Ms. Shourd's friends, Josh Fattal and Shon Meckfessel, joined them on their

trip to Kurdistan.

15.     On July 30, 2009, Shane, Ms. Shourd, and Mr. Fattal visited Ahmad Awa, a

waterfall that was a popular tourist destination in Kurdistan.  The area around the waterfall was

filled with families picnicking and vendors selling food and souvenirs.  Shane, Ms. Shourd, and

Mr. Fattal spent the night camping and, in the morning, asked a tea vendor if there were any

hiking trails nearby.  The vendor pointed them up a path.  They planned to hike for a few hours

before meeting up again with Mr. Meckfessel, who had decided not to visit Ahmad Awa the day

before with the others.

16.     Shane, Ms. Shourd, and Mr. Fattal hiked for several hours, until they had left the

populated waterfall far behind.  They seemed to be the only people around for miles.  Suddenly,

the group spotted a uniformed soldier ahead, whom they assumed was Iraqi.  The soldier had a

gun, and he motioned for the group to approach him.  They felt they had no choice but to

comply.

17.     As they drew closer, they saw a dozen other similarly dressed soldiers nearby.

When they were close enough to speak to the soldier, he repeated "Iran" several times.  Shane

soon realized that the red, white, and green flag on his uniform—and that of the other soldiers—

was the Iranian flag.  They had no idea they were even within a hundred miles of Iran; there was

no flag, border crossing, or anything to indicate they had at some point crossed from Iraq into

Iranian territory.

18.     The soldiers all spoke Farsi, a language which neither Shane, nor Ms. Shourd, nor

Mr. Fattal could understand or speak.  They eventually realized the soldiers were identifying

them as "*Amreekaaii*" (American).  The group stood by as the Iranian soldiers took and rummaged through their things:  cameras, wallets, passports, and other hiking gear.

19.     This was not the first time Shane, as a journalist working in the Middle East, had been detained.  His immediate reaction was to try to stay calm.  But as time passed with no indication the soldiers would let them go, he quickly became more concerned.  Shane asked for permission to use his cell phone, and the soldiers surprisingly permitted him to do so.  He called Mr. Meckfessel, and told him the three Americans were in Iranian custody.

20.     Eventually, the soldiers directed the group to get into an SUV.  Unable to escape safely, Shane and Mr. Fattal instead became limp, as they would often do when protesting.  The soldiers dragged them into the vehicle.  The soldiers barked at Ms. Shourd to follow, and, seeing no other option, she reluctantly joined her companions.

21.     Over the next three days, Shane, Ms. Shourd, and Mr. Fattal were driven to various locations in Iran.  Sometimes, the soldiers would indicate they were heading back to Iraq to put the group at ease, but Shane become increasingly afraid they were actually heading deeper into Iran.

22.     The soldiers seemed not to know what to do with them.  At some point, the soldiers took Shane, Ms. Shourd, and Mr. Fattal to an apartment building to stay overnight.  In one town, the soldiers found a teacher who spoke English and translated for them.  The soldiers interrogated them, wanting to know why they had entered Iran.  The interrogators accused the group of being American spies, and asked what American officials sent them into Iran.  They also falsely claimed Iraqi police had warned the group not to come near Iran.

23.     At one point, the soldiers drove Shane, Ms. Shourd, and Mr. Fattal into a remote desert during the middle of the night.  The soldier in the passenger seat held a gun in his lap, and

cocked it several times.  Shane and the others were certain they were about to be killed.  Shane

trembled as he imagined them being executed, one by one.  The soldiers parked the SUV at a

large, empty building in the desert, and forced Shane, Ms. Shourd, and Mr. Fattal out of the car.

To Mr. Bauer's shock and relief, they were directed into a hold in the building—a jailhouse—

where they were held overnight.

24.     Three days after crossing into Iran, Shane, Ms. Shourd, and Mr. Fattal were

brought to the Iranian capital of Tehran and driven to Evin Prison, a notoriously brutal prison

infamous for holding political prisoners.  They were blindfolded and brought out of the vehicle.

Mr. Fattal was dragged away from the other two, despite their screams and pleas to be kept

together.  Shane and Ms. Shourd were pushed up the stairs, away from Mr. Fattal, and put into

adjacent cells.

25.     Shane's cell was small, measuring about ten feet by ten feet.  There was an

adjoining bathroom, but no bed or mattress to sleep on.  There were only a couple of thin

blankets and a pillow.  The cell had only one small window about ten feet off of the ground, and

there was an overhead light that remained on at all times.  Steel doors barred the entrance to the

cell, with a small slot for the guards to slide food to him.  As the steel doors closed on him,

Shane was left alone with nothing except the sound of Ms. Shourd's muffled sobs.

26.     Isolated in his cell, Shane was consumed by his own thoughts.  He wondered

whether his family had any idea what had happened to him.  He had no idea how long he would

remain in this cell, and was terrified of what might happen.  At one point, he heard the sounds of

someone screaming and being tortured.

27.     With few exceptions, Shane was brought out of his cell only for interrogations,

where the guards constantly attempted to gather information to portray him as an American spy.

Interrogators sometimes blindfolded Shane and threatened if he did not answer their questions truthfully—in other words, as they wanted him to—then he would remain in prison for a very long time.  They repeatedly asked him to write out his life story and background on a piece of paper.  When he told them he was a journalist, they asked him to agree to write news articles for them concerning the subjects they suggested; Shane refused.

28.     The interrogators asked Shane for his email password.  He initially refused, but eventually gave in to their demands.  After the interrogators saw a Google alert in his email inbox regarding Blackwater and American-Iraqi relations, which Shane had set in the course of his reporting on Iraq, they asked him absurd questions about his "involvement" with Blackwater.  Shane tried to explain he was only a reporter—he was not personally involved—but the interrogators refused to believe him.

29.     One interrogator later told Shane he knew that Shane was not a spy, but that it was up to the U.S. government and the Iranian government to negotiate his release.  Shane felt even more hopeless after realizing he was being used as leverage between Iran and the United States.

30.     After thirty days, Shane, Ms. Shourd, and Mr. Fattal were moved to another section of Evin Prison.  During the transition, Shane initially thought they were being released, but his hopes were soon dashed when he was separated from Ms. Shourd and Mr. Fattal.  Shane was taken away and put into a small cell, about nine feet long and his arms' length in width.  Unlike his previous cell, this one was completely devoid of any furniture, blankets, and pillows; it only contained the Quran.

31.     Shane remained in the cell for days before he was able to talk to anyone.  New interrogators came, and the interrogation process started all over again.  This time, however, the

interrogators knew much more about Shane.  Their questions were more cunning, trying to get Shane to share more about his background and what he knew about the border between Iran and Iraq.  They pressured him to confess to having entered the country purposefully in order to spy on Iran.  Whenever he refused, the interrogators told him he was lying.  They told him his refusal to tell the truth meant he would be in Evin Prison for a very long time, and sent him back to his cell with no contact with anyone for days.

32.     Between interrogations, Shane spent time in his cell, alone.  He often heard other people screaming, crying, and begging as they were moved from their cells.  Shane suspected that they were being tortured, and was terrified he would be next.  Isolated in his cell, Shane felt as though he were losing his mind.  He had gone nearly two weeks without seeing Ms. Shourd or Mr. Fattal, and all he could do while alone was trying to remember their voices.  Shane lost any sense of time, which seemed to move neither forward, nor backward.  Days passed him by as he hoped each one would be the day he would have human contact with someone other than an interrogator.

33.     After several months, Shane was suddenly moved into another cell with Mr. Fattal.  There were mattresses on the floor for them, but nothing else.  They had to adjust to being able to talk freely to each other after experiencing such long periods of not talking to anyone.  Shane and Mr. Fattal had limited contact with Ms. Shourd, except for a few minutes when they were allowed to visit her in the prison courtyard—initially once a week, then for thirty minutes to an hour per day.  Although Shane was immensely relieved to have a companion, he felt guilty he was in a cell with Mr. Fattal while Ms. Shourd was alone.  He felt as though he were an accomplice in her torture.

34.     In the spring of 2010, the Iranian guards permitted Shane, Ms. Shourd, and Mr. Fattal to call their families.  Shane was able to reach his father, and let him know he was alive, but they were only given five minutes to talk.  After Shane begged and pleaded to call his mother, the guards allowed him two minutes to talk to her.  Cindy told Shane she loved him, and his family was doing everything in its power to help get him home.

35.     For the duration of Shane's imprisonment, Cindy had been writing letters to her son telling him she was trying to come visit him.  After Shane had spent nearly a year at Evin Prison, Cindy—along with Mr. Fattal's and Ms. Shourd's mothers—was able to visit Iran to see her son.  She told him of all the changes to her and her family's lives since Shane had been taken hostage, including that she was forced to stop working.  Shane's relief at seeing his mother suddenly turned into guilt.  At the end of the visit, Shane was heartbroken at the look on his mother's face as she walked away to leave.  They had no idea when, or if, they would see one another again.

36.     In September 2010, Ms. Shourd was suddenly released from Evin Prison.  Shane was relieved, especially since she had been held alone in solitary confinement for so long, but he had no idea what this meant for his own freedom.  Ms. Shourd's release coincided with the end of Ramadan and the appearance of Iran on the international stage at the United Nations General Assembly.  When would Iran find it in its interest to release him and Mr. Fattal?  There was nothing for him to do but wait.

37.     While at Evin Prison, Shane went on several hunger strikes, and both his mental and physical health suffered as a result.  He lost a significant amount of weight each month, took several trips to the hospital due to a bleeding ulcer, and was diagnosed with anemia.

38.     On February 6, 2011, eighteen months after he had been detained, Shane was finally brought before a judge, and charged with illegal entry and espionage.  He had not been allowed to meet with his attorney since before Ms. Shourd's release.

39.     At a second hearing on July 31, 2011, nearly six months later, Shane and Mr. Fattal were brought before a judge who Shane later learned was notorious for sentencing prisoners to death.  The judge questioned Shane and Mr. Fattal about their passports and the countries they had visited.  The prosecutor alleged there was "evidence" they were involved in an American-Israeli conspiracy against Iran, a mission given to them by the CIA.

40.     Twenty days later, Shane and Mr. Fattal appeared for a third hearing, where they were found guilty on both charges, and each sentenced to eight years in prison.  Shane pleaded with the judge to be released on humanitarian grounds due to his rapidly deteriorating health.  His pleas were ignored.

41.     Nonetheless, on September 21, 2011, Shane and Mr. Fattal were abruptly released from Evin Prison.  They were flown to Oman, where they reunited with their families and Ms. Shourd.

### The Family's Efforts to Help Shane

42.     Shane's family members spent the duration of his imprisonment terrified about what might happen to their son or brother, and doing everything in their power to ensure he returned home safely.

43.     Fortunately, Mr. Meckfessel had contacted the U.S. embassy in Baghdad immediately after receiving Shane's phone call.  Cindy, Shane's mother, learned of Shane's capture and imprisonment in early August 2009.  She received a phone call from the U.S. Embassy in Baghdad informing her Shane, Ms. Shourd, and Mr. Fattal were in Iranian custody.

Cindy knew Shane had previously been detained by foreign governments in the Middle East, so she initially tried to remain calm.

44.     Cindy contacted Shane's father and sisters to inform them about Shane's detention in Iran.  Shane's father, Al, heard the news about Shane while he was traveling to meet his daughter Nicole for an annual family camping trip.  Al felt as though his heart had fallen out of his chest—he was devastated, and did not know what to do.

45.     Shane's sister, Nicole, and her husband had just stopped at IKEA on their way to the family camping trip when they received the call about Shane's detention.  Nicole instantly became numb, and dropped to the ground.  She contacted Mr. Meckfessel to try to obtain more information, but he knew no more than she did.  For months, she and Shane's family members had almost no information about what had happened to him—they knew only that he had been taken into Iranian custody.

46.     Shannon, Shane's youngest sister, was working at the YMCA in Boulder, Colorado when she received the news.  She was in shock and, like the others, had limited information regarding Shane's whereabouts.  The next day, Shannon flew to Minnesota to be with her family, and saw the news of Shane's detention on the television on the plane.

47.     The family, along with the families of Ms. Shourd and Mr. Fattal, quickly came together to figure out what they could do.  Their lives changed drastically.  Officials from the Federal Bureau of Investigation ("FBI") came to Cindy's home; she and the rest of her family soon found themselves in regular contact with the FBI, the U.S. Department of State, and the media.

48.     Cindy, Al, Nicole, and Shannon worked with the Shourd and Fattal families to start a campaign for the release of their loved ones.  They worked with a public relations firm

and a media adviser (who took their case pro bono) to raise awareness of their children's imprisonment. They launched a website, www.freethehikers.org, and engaged in media tours across the country.

49.      Cindy was forced to leave her beloved career as a dog-trainer and businessowner after thirty-three years; she found herself unable to maintain her business while balancing the tremendous demands of lobbying for her son's release. She was traveling constantly; Cindy made several trips to New York City to talk with the media, as well as visits to Washington, D.C. to speak with White House officials, senators, and foreign ambassadors. Ms. Shourd's mother, Nora, moved from California to live in Cindy's Minnesota home, where the two women worked together to seek their children's release.

50.       While campaigning, the media constantly hounded Cindy. They often waited for her at the end of her driveway, or met her and Nora at airports when they traveled. Cindy felt she could not trust anyone, and she was careful not to confide in anyone about how she was feeling.

51.      Cindy experienced a number of health complications during Shane's imprisonment. She was unable to sleep without medication. She suffered from adrenal fatigue and Hashimoto's disease, which was aggravated by the stress of her situation; she was also anemic throughout the first year of Shane's imprisonment. She had to undergo a total hysterectomy, which was made even more stressful by her fear of being disconnected from any news regarding her son during the surgery.

52.      Cindy wanted desperately to travel to Iran to see Shane in person. It was the only way for her to verify what condition Shane was in, and to let him know how much the entire family was doing to try to bring him home. Her visit to Iran was incredibly stressful, and she felt

an immense responsibility to bring Shane back to the United States with her.  Cindy was

devastated to leave him in Iran, not knowing when she would see him again.

53.     Al also had to adjust to his "new normal" of balancing work with campaigning

for Shane's release.  He worked long hours during the day on Shane's case, and focused on his

business at night.  Despite his and his family's efforts, Al often felt he was "against a wall," and

that there was nothing he could do to help his son.  He had so little information about what was

happening to his son, and officials told him there was not much they could do.

54.     Shane's sisters, Shannon and Nicole, wrote letters to a wide variety of

government officials in order to gather more information and raise awareness about Shane's

imprisonment.  They were involved in fundraising, and also took trips to Washington, D.C. and

New York City to participate in media interviews.

55.     Nicole took odd jobs with flexible schedules so that she could travel or participate

in conference calls on a moment's notice.  Like her family members, Nicole received a great deal

of unwanted media attention, and was often bombarded with insensitive questions.  Her stress

kept her awake at night, and she needed medication to sleep.  Nicole found herself constantly

looking for new information online about Shane's imprisonment.  She became severely

depressed, and often would not leave her house for days.  At one point, Cindy sent the family

dog to live with Nicole, just to give Nicole a reason to go outside.

56.     Shannon, who was a graduate student at the time of Shane's imprisonment, was

forced to take a semester off from school in order to focus on helping her family bring Shane

home.  She was later able to return as a part-time student, but since her program was not

designed for part-time study, she fell behind an entire year.  Her efforts on the campaign required

her to cut back significantly on her hours at work, resulting in a heavy financial strain.  Shannon

was diagnosed with depression, and went on medication during this time; her health declined, she became ill, and was diagnosed with a chronic thyroid disorder, which was exacerbated by stress.  She worried the Iranian government would learn about her relationship with her now-wife, and that Shane might suffer consequences as a result.  Shannon lost weight, and had trouble sleeping throughout her brother's imprisonment.

**Post-Release**

57.     After his release, Shane was relieved to be released and reunited with his family, but quickly discovered he would need to make major adjustments to get back to "normal" life. In the immediate aftermath of his release, Shane was unable to make even basic decisions like what he should eat—he had grown unaccustomed to having any control whatsoever over his life. He found himself overwhelmed by all of the stimuli around him.

58.     Shane's imprisonment caused him severe psychological and emotional distress. He suffered from Posttraumatic Stress Disorder ("PTSD"), and had trouble being around crowds. He sought help from mental health professionals, and spent years in therapy.

59.     Cindy worked so tirelessly to bring her son home that, immediately following his release, her body completely shut down from such a traumatic experience, and she slept for 24 hours straight.  She suffered, and continues to suffer, from PTSD and anxiety.  Even years later, she still experiences sensitivity to sound and struggles with chronic fatigue.  She tends to isolate herself from others.

60.     Nicole and Shannon similarly suffer from high levels of anxiety and stress, particularly when they are in group situations or the subject of media attention.  Being in situations where she feels like she lacks control causes extreme anxiety for Nicole, bringing back the loss of control she felt during her brother's imprisonment.  She often feels sadness and

14

heaviness during the fall season, which she attributes to the several falls that passed during

Shane's imprisonment where his release seemed particularly likely, but ultimately did not occur.

Nicole also suffers from some memory loss, and finds it hard to remember specific details

regarding the two years that Shane was in Iran.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE AND HOSTAGE-TAKING: 28 U.S.C. § 1605A) (SHANE, AL, CINDY, NICOLE, and SHANNON)

61.     Paragraphs 1 through 60 above are incorporated as if set forth herein.

62.     Shane, Al, Cindy, Nicole, and Shannon were citizens of the United States when

Shane was arrested and held unlawfully by Iran.  While being held hostage, Shane was tortured

as described herein.

63.     Anti-terrorism provisions codified at 28 U.S.C. § 1605A(a) establish a federal

right of action against Iran for committing acts of hostage-taking and torture.

64.     Section 1605A provides four elements for a claim against a foreign state, all of

which are met here:

a.     That defendant be designated as a state sponsor of terrorism;

b.     That claimant be a national of the United States;

c.     That the foreign country must be given reasonable opportunity to arbitrate that

claim if the conduct took place on foreign soil; and

d.     That the personal injury is alleged to have been caused by "an act of torture,

extrajudicial killing, aircraft sabotage, hostage-taking, or the provision of material

support or resources for such an act."

65.     Iran was designated a state sponsor of terrorism by the Secretary of State on

January 19, 1984.  *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

66.     Shane, Al, Cindy, Nicole and Shannon were citizens of the United States at the time of Shane's imprisonment and torture.

67.     The definition of "torture" under the FSIA, derived from Section 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), codified at 28 U.S.C. § 1350 (note), includes:

> Any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person is committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind . . . .

68.     While Shane was in Iran's custody and control, Iran intentionally subjected Shane to 781 days of severe pain and suffering, including solitary confinement, emotional and mental abuse, and threats of continued confinement, all with the intent to obtain a false confession that he was spying on behalf of the United States.  Iran's conduct constitutes torture as defined under the FSIA.

69.     "Hostage-taking" under the FSIA, 28 U.S.C. § 1605A(h)(2), as derived from Article 1 of the United Nations International Convention Against the Taking of Hostages, Dec. 17, 1979, 1316 U.N.T.S. 205, is defined as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person , or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

70.     Iran detained Shane on false charges and threatened, interrogated, and continued to detain Shane for 781 days to win political favors or other concessions from the United States. Iran's conduct was hostage-taking as defined under the FSIA.

71.     A foreign state is held vicariously liable for the acts of its officials, employees, or agents.  28 U.S.C. § 1605A(c)(4).

72.     Shane and his relatives suffered, and continue to suffer physical and psychological harm to this day because of Shane's hostage-taking and torture by Iran.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION – ASSAULT AND BATTERY) (SHANE)

73.     Paragraphs 1 through 72 above are incorporated as if set forth herein.

74.     Iran committed or is responsible for numerous acts of assault and battery upon Shane during his confinement and torture.

75.     Under the FSIA, a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.

76.     Iran is stripped of its immunity under the FSIA because of its acts of hostage-taking and torture, and is therefore liable for torts in the same manner and to the same extent as a private individual.

77.     Iran applied force to Shane's person, and took actions reasonably tending to create Shane's apprehension that Iran was about to apply such force to him.  Iran also intended harmful or offensive contact with Shane without his consent.

## COUNT III

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) (SHANE)

78.     Paragraphs 1 through 77 above are incorporated as if set forth herein.

79.     Iran's use of solitary confinement, threats of indefinite confinement, manipulation, and restrictions on Shane's contact with his family and an attorney was intentional, reckless, extreme, and outrageous, and caused Shane severe emotional distress.

80.     Iran's treatment of Shane violated acceptable norms of treatment under both U.S. and international law, and was also for that reason extreme and outrageous.

81.     Iran's actions left Shane severely emotionally and psychologically damaged.

## COUNT IV

### (§ 1605A(c) CAUSE OF ACTION – FALSE IMPRISONMENT) (SHANE)

82.     Paragraphs 1 through 81 above are incorporated as if set forth herein.

83.     Shane was deprived of liberty without cause and without legal justification.  Iran held Shane despite knowledge that it had no basis to do so.

## COUNT V

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/SOLATIUM) (AL, CINDY, NICOLE, and SHANNON)

84.     Paragraphs 1 through 83 above are incorporated as if set forth herein.

85.     "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."  Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46; *accord Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C. 2010); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 28 (D.D.C. 2008).

18

86.     When a defendant's conduct is directed at a third person, the Restatement

generally requires that a plaintiff be a "close family member" and have "contemporaneously

perceive[d] the event."  Restatement (Third) of Torts:  Liability for Physical & Emotional Harm

§ 46 cmt. m; *accord Valencia*, 774 F. Supp. 2d at 14.

87.     "All acts of terrorism are by their very definition extreme and outrageous and

intended to cause the highest degree of emotional distress, literally, terror, in their targeted

audience."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009)

(quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  That is,

"the function of the presence requirement . . . is, in state-sponsored terrorism cases, fulfilled by

the horrific and terrifying nature of terrorism itself[.]"  *Valencia*, 774 F. Supp. at 14.  Hostage-

taking and torture "are, by their very nature, intended to harm and to terrify by instilling fear of

such harm."  *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019).

88.     Because Shane was taken hostage and tortured, each of his relatives only needs to

demonstrate that she or he had a close relationship with Shane, and that she or he did suffer

emotional distress to create a claim for intentional infliction of emotional distress.

89.     Iran's taking and imprisonment of Shane was extreme and outrageous.  Shane's

imprisonment caused each of his family members emotional harm, and each of them suffered

depression, anxiety, and fear during and after Shane's imprisonment.

90.     Cindy and Al – Shane's parents – had a close relationship with Shane during his

childhood.  Shane maintained a close relationship with both of his parents even when he was not

physically present with them.  Cindy was forced to leave her job for the duration of Shane's

imprisonment so that she could focus on bringing him home.  Similarly, Al had to adjust his life

to prioritize campaigning for Shane's release ahead of work.  Cindy and Al have suffered from stress, fear, and anxiety, even after Shane returned home.

91.     Nicole and Shannon also had close-knit relationships with their brother, Shane. As the oldest sibling, Shane took care of his younger sisters; Shane was a big part of his sisters' upbringing, even after he moved to California with their father during high school.  Shane maintained his closeness with his sisters even while traveling around the world as an adult. When Shane was held hostage, Nicole and Shannon worked day and night to advocate for him, sacrificing school and jobs to bring their brother home.  As a result, each of them experienced, and still experiences, depression, stress, fear, and anxiety surrounding Shane's detention.

## PRAYER FOR RELIEF

1.     As a result of the personal injuries Shane Bauer, Al Bauer, Cindy Fischer, Shannon Bauer, and Nicole Lindstrom have suffered due to the acts of torture and hostage-taking by Iran, they are entitled to economic damages and compensatory damages for pain and suffering and solatium, all of which are recoverable under the FSIA.  28 U.S.C. § 1605A(c).

2.     In addition to all appropriate compensatory damages, Plaintiffs are entitled to punitive damages because Iran's acts were intentional, malicious, and performed deliberately to injure, damage, and harm Shane Bauer, Al Bauer, Cindy Fischer, Shannon Bauer, and Nicole Lindstrom.

3.     Plaintiffs further seek costs, attorneys' fees, and such other relief as may be just and proper, including pre-judgment interest.

Dated:  August 3, 2022

Respectfully Submitted,

_/s/ Emily P. Grim_
Emily P. Grim (D.C. Bar # 1006597)
Sarah A. Sraders (D.C. Bar # 1049001)
Gilbert LLP
700 Pennsylvania Ave., SE
Suite 400
Washington, DC 20003
Tel:  (202) 772-2200
Fax:  (202) 772-3333
grime@gilbertlegal.com
sraderss@gilbertlegal.com

_Attorneys for Plaintiffs_